UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Armando Lisasuain

   v.                                           Case No. 19-cv-593-PB

Paula Mattis, Debra Robinson,
and Daryl Bazydlo

## REPORT AND RECOMMENDATION

Before the court is Armando Lisasuain's Complaint (Doc. No. 1) and his "Addendum to Complaint under the Civil Rights Act 42 U.S.C. § 1983" (Doc. No. 9). The court has docketed that latter filing twice, first as a complaint addendum (Doc. No. 9), and as Mr. Lisasuain's objection (Doc. No. 10) to the April 20, 2020 Report and Recommendation (Doc. No. 6) ("April 20 R&R"). The complaint addendum (Doc. No. 9) and the original complaint (Doc. No. 1) are before the court for preliminary review, pursuant to the April 20, 2020 Order (Doc. No. 7), LR 4.3(d)(1), and 28 U.S.C. § 1915A. This R&R and the Order issued this date replace the April 20 R&R, which the court has withdrawn on this date.

## Standard

The court may dismiss claims asserted in an inmate's complaint and in an addendum to that complaint, if the court lacks subject matter jurisdiction, a defendant is immune from

the relief sought, the complaint fails to state a claim, or the action is frivolous or malicious.  See 28 U.S.C. § 1915A(b).  In determining whether a pro se complaint states a claim, the court must construe the complaint liberally.  See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam).  To determine whether to dismiss claims for failure to state a claim, the court takes as true the factual content in the complaint and complaint addenda and inferences reasonably drawn from those facts, strips away the legal conclusions, and considers whether plaintiff has stated a claim that is plausible on its face.  Hernandez-Cuevas v. Taylor, 723 F.3d 91, 102-03 (1st Cir. 2013) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

## Background

I.   Disciplinary Proceedings and Discharge from RTU

On November 23, 2018, when Mr. Lisasuain was housed in the New Hampshire State Prison ("NHSP") Residential Treatment Unit ("RTU"), another RTU inmate, who was white, assaulted him.  Mr. Lisasuain, who does not identify as white, asserts he struck back to protect himself.  Corrections Officers ("COs") charged both inmates with disciplinary violations, and both inmates were transferred to the Special Housing Unit ("SHU") for a period of time during and after the disciplinary proceedings.  Mr.

Lisasuain alleges that the inmate who attacked him pleaded guilty to the incident report immediately after the fight. That inmate spent five days in SHU as a penalty imposed for his guilty plea before returning to the RTU.

Mr. Lisasuain alleges that he initially pleaded not guilty. On December 5, 2018, officers moved Mr. Lisasuain to the SHU during an investigation of the charges. Seven days later, the Hearings Officer found that he was not the aggressor, dropped the disruptive conduct charge, and reduced the fighting charge to a Level "C" offense, because Mr. Lisasuain had swung back. Mr. Lisasuain pleaded guilty to that lesser charge and was released to a medium custody unit approximately seven days later. Mr. Lisasuain spent a total of about fifteen days in SHU, including seven days in Pending Administrative Review status prior to his hearing, and approximately one week in segregation after he pleaded guilty.

Mr. Lisasuain further alleges that after his release from SHU, he was dropped from the RTU program. He asserts he did not receive the transition hearing required by prison policies prior to RTU discharge. He further alleges that the reason he was given for his discharge from the RTU - "program failure" - was a pretext, as he had satisfied all program requirements and completed all of the programming available in the RTU.

II.  CPAP Machine

Mr. Lisasuain has alleged that for many years preceding and including part of his incarceration at the NHSP, he frequently woke up at night gasping for breath and was unable to sleep for more than two to three hours per night.  After he complained to his NHSP mental health care provider about his sleeping issues, he underwent a sleep study at the NHSP.  The nurse who wired him for the sleep study told him that he "could die," presumably as a result of his nighttime breathing issues.  Doc. No. 9, at 7.  Following the sleep study, NHSP health care providers prescribed a CPAP machine,[1] which he received approximately two weeks after the sleep study, at some time prior to November 23, 2018.

Mr. Lisasuain alleges that, for some of the time he spent in SHU, including the four or five days he spent in Cell 1 on I-Tier, and lasting through the first four or five days he spent on F-Tier, he lacked access to his CPAP machine.  In particular, he alleges that when officers moved him into Cell 1 on I-Tier on or about December 5, 2018, he noticed that the cell did not have

---

[1]A CPAP (Continuous Positive Airway Pressure) machine is a medical device that "uses mild air pressure to keep . . . breathing airways open," which may be prescribed "to treat sleep-related breathing disorders including sleep apnea."  U.S. Dep't of Health and Human Servs., Nat'l Heart, Lung, and Blood Inst., Health Topics, CPAP, available at https://www.nhlbi.nih.gov/health-topics/cpap (last visited Feb. 5, 2021).

4

an electrical outlet.  He told the NHSP Corrections Officer who moved him there that he would not be able to survive a night there, since he needed to plug in his CPAP machine.  That officer did not take any steps to move Mr. Lisasuain into a different cell.  On the first day he spent in Cell 1 on I-Tier, Mr. Lisasuain told at least five other COs (whose names he does not know) that he needed his CPAP machine because of his night-time breathing issues, and that the lack of an outlet in Cell 1 would prevent him from using that device.  In addition, he told each of the nurses (whose names he does not know) who came to his cell on I-Tier during the four or five days that he was in that cell, that he needed his CPAP machine.  He further alleges that he repeated that complaint to the nurses (whose name he does not know) whom he saw between December 8 and December 13, 2018, after corrections officers moved him to F-Tier, before his CPAP machine was delivered to him on F-Tier on or about December 13, 2018.  During the time period when he did not have access to his CPAP machine, Mr. Lisasuain asserts that he slept no more than two to three hours per night, and he woke up many times gasping for breath.  Doc. No. 9, at 9.

III. <u>Claims</u>

The court identifies the claims for relief asserted by Mr.

5

Lisasuain in Doc. Nos. 1 and 9 as follows:

1.   The SHU I-Tier COs identified in Document No. 9 as John Does, and the SHU Nurses on I-Tier and F-Tier, identified in Document No. 9 as Jane Does, violated Mr. Lisasuain's Eighth Amendment rights, in that, with knowledge of Mr. Lisasuain's unmet medical need for a CPAP machine, they failed to take any reasonable steps to provide him with his CPAP machine for approximately eight nights, comprising about four days on I-Tier and four days on F-Tier, beginning when Mr. Lisasuain was transferred to I-Tier on or about December 5, 2018, and ending when the CPAP machine was delivered to him in his F-Tier cell on or about December 13, 2018.

2.   Defendants violated Mr. Lisasuain's Fourteenth Amendment right to due process by:

   a.   Placing him in SHU for approximately fifteen days; and

   b.   Transferring him out of the RTU on the basis of "program failure," without cause and without a hearing, in violation of prison policies.

3.   Defendants violated Mr. Lisasuain's Fourteenth Amendment right to equal protection by discriminating against him on the basis of his race, in that, as an inmate who does not identify as white:

   a.   He was sanctioned more severely than the white inmate who assaulted him, even though the hearing officer concluded that he was not the aggressor in the altercation, and he was allowed to plead guilty to a lower level disciplinary offense than that for which the white inmate was sanctioned; and

   b.   Mr. Lisasuain was discharged from the RTU, on the false pretext of "program failure," when the white inmate who was the aggressor was allowed to return to the RTU.

**Discussion**

I.  Eighth Amendment Claim (Claim 1)

An Eighth Amendment claim challenging the adequacy of prison health care services or interference with an inmate's receipt of medical care has both an objective and a subjective component.  See Wilson v. Seiter, 501 U.S. 294, 298 (1991). "[T]he deprivation alleged must be, objectively, 'sufficiently serious.'"  Farmer v. Brennan, 511 U.S. 825, 834 (1994) (citations omitted).  The objective component may be established by evidence of a health need, "that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  Miranda-Rivera v. Toledo-Dávila, 813 F.3d 64, 74 (1st Cir. 2016).

To prevail on an Eighth Amendment claim, a plaintiff must also present evidence of the defendants' deliberate indifference to that serious health need.  See Farmer, 511 U.S. at 828-29; Leite v. Bergeron, 911 F.3d 47, 52–53 (1st Cir. 2018) ("'plaintiff must provide evidence that the defendant had 'actual knowledge of impending harm, easily preventable,' and yet failed to take the steps that would have easily prevented that harm'" (citations omitted)).  Deliberate indifference is not established by evidence of negligence.  See Ruiz-Rosa v.

Rullan, 485 F.3d 150, 156 (1st Cir. 2007) ("substandard care, malpractice, negligence, inadvertent failure to provide care, and disagreement as to the appropriate course of treatment are all insufficient to prove a constitutional violation" (internal citations and quotation marks omitted)); see also Kosilek v. Spencer, 774 F.3d 63, 82 (1st Cir. 2014).

In Claim 1, Mr. Lisasuain alleges that the unnamed defendant "John Doe" SHU I-Tier COs and unnamed defendant "Jane Doe" SHU Nurses on I-Tier and F-Tier violated his Eighth Amendment rights by their deliberate indifference to his complaint that he needed access to his CPAP machine for approximately eight days while in the SHU. The facts alleged by Mr. Lisasuain in Document Nos. 1 and 9 state a claim upon which relief can be granted as to one or more of the John Doe COs and Jane Doe Nurses who both knew he lacked access to a CPAP machine in SHU and whose acts or omissions delayed his access to that CPAP machine. In the Order issued this date, the court has directed that this matter may be served, pursuant to the Agreement on Acceptance of Service, with respect to the claim summarized herein as Claim 1.

II. Fourteenth Amendment Due Process Claims (Claim 2)

To establish that his due process rights have been violated, a plaintiff must demonstrate that he has suffered a deprivation of a protected interest in life, liberty, or property. See Mathews v. Eldridge, 424 U.S. 319, 332 (1976). "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty.'" Wilkinson v. Austin, 545 U.S. 209, 221 (2005) (citations omitted). "[T]he Constitution itself," however, "does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement." Id.

Protected interests may also arise from prison regulations, subject to the limitations set forth in Sandin v. Conner, 515 U.S. 472 (1995). See Wilkinson, 545 U.S. at 221-22. Under Sandin, the court considers whether the restrictions at issue impose an "'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" See id. at 223 (quoting Sandin, 515 U.S. at 484). Mr. Lisasuain has failed to show that his placement in SHU and his subsequent discharge from the RTU, allegedly without cause, imposed any atypical and significant hardship upon him, in relation to the ordinary incidents of prison life. See, e.g., Beamon v. Pollard, 711 F. App'x 794, 795 (7th Cir. 2018) ("Whether a liberty interest is

implicated by disciplinary segregation depends on both the time and conditions of confinement, and 135 days in segregation — absent any atypical conditions related to confinement — does not violate the Fourteenth Amendment." (citation omitted)).

Moreover, to the extent plaintiff bases his due process claim on prison officials' violation of prison policies, manual, and/or guidelines, such allegations, without more, do not give rise to an actionable claim of any violation of his federally protected rights.  See Evans v. Baker, 442 F. App'x 108, 110 (5th Cir. 2011) ("The failure to comply with prison regulations does not constitute a per se constitutional violation when other constitutional safeguards have been employed.").  Accordingly, as Mr. Lisasuain has not pleaded facts sufficient to state a claim of a violation of his federal due process rights upon which relief can be granted, arising from his placement in SHU and discharge from the RTU, the district judge should dismiss Claims 2(a) and 2(b).

III. Equal Protection Claims (Claim 3)

   A.   Elements

The Fourteenth Amendment Equal Protection Clause dictates "that 'similarly situated persons are to receive substantially similar treatment from their government.'"  Kuperman v. Wrenn,

645 F.3d 69, 77 (1st Cir. 2011) (citation omitted).  To assert an equal protection claim, a plaintiff must state facts sufficient to show that, as compared to others similarly situated, the plaintiff was treated differently based on an improper consideration.  See id. at 78.

    B.    Claim 3(a)

The complaint alleges that Mr. Lisasuain was treated less favorably than another inmate of a different race, with respect to the disciplinary proceedings that followed the November 23, 2018 fight.  Mr. Lisasuain has alleged that the other inmate pleaded guilty immediately, while Mr. Lisasuain initially pleaded not guilty and then was allowed to plead guilty to a lower level disciplinary offense after a hearings officer concluded that he was not the aggressor.  Mr. Lisasuain has not pleaded any facts to show that he and the other inmate had the same pertinent conviction record and disciplinary history, and thus he has failed to assert facts which demonstrate that the other inmate in the altercation was similarly situated to him in all respects relevant to the imposition of disciplinary sanctions.  Accordingly, the district judge should dismiss Claim 3(a) for failure to state an equal protection/race discrimination claim upon which relief can be granted.

### C.  Claim 3(b)

The complaint further alleges that Mr. Lisasuain was treated less favorably than other inmates discharged from the RTU, in that: he did not receive a transition hearing as required by prison policies; the reason provided for his discharge ("program failure") was pretextual, as he completed all programming available in the RTU; and the other inmate who started the fight was allowed to return to the RTU.  Mr. Lisasuain has not alleged facts demonstrating, however, that there were no other factors relating to the other inmate's mental health history and/or housing needs that could provide race neutral reasons for the difference in that inmate's treatment following his release from the RTU; that other inmates who are white and are discharged from the RTU following disciplinary proceedings generally receive transition hearings; that other inmates who are white who complete all programming available through the RTU are generally not discharged for reasons including "program failure."  Accordingly, the district judge should dismiss Claim 3(b), for failure to state an equal protection/race discrimination claim upon which relief can be granted.

IV.  Named Defendants

The named defendants, Paula Mattis, Debra Robinson, and Daryl Bazydlo, should be dropped from this case, as no claim upon which relief can be granted is stated against any of them.

## Conclusion

For the foregoing reasons, the district judge should dismiss the claims identified in this R&R as Claims 2(a), 2(b), 3(a), and 3(b), for failure to state a claim upon which relief can be granted; and defendants Paula Mattis, Debra Robinson, and Daryl Bazydlo should be dropped as parties as no viable claim is stated against them.  Any objections to this Report and Recommendation must be filed within fourteen days of receipt of this notice.  See Fed. R. Civ. P. 72(b)(2).  That period may be extended upon motion.  Failure to file objections within the specified time waives the right to appeal the district court's order.  See Santos-Santos v. Torres-Centeno, 842 F.3d 163, 168 (1st Cir. 2016).

_____
Andrea K. Johnstone
United States Magistrate Judge

February 11, 2021

cc:  Armando Lisasuain, pro se